# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MIKE VEGA, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENERGY TRANSFER LP, KELCY L. WARREN, THOMAS E. LONG, MARSHALL S. MCCREA III, BRADFORD DICKERSON WHITEHURST, AND JOHN W. MCREYNOLDS<br><br>Defendants. | Case No. 1:22-cv-4614<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 3

PARTIES .............................................................................................................................. 4

SUBSTANTIVE ALLEGATIONS ..................................................................................... 5

    A.  BACKGROUND.......................................................................................................... 5

    B.  MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD 9

    C.  THE TRUTH BEGINS TO EMERGE ...................................................................... 21

CLASS ACTION ALLEGATIONS ................................................................................ 17

APPLICABILITY OF PRESUMPTION OF RELIANCE  FRAUD ON THE MARKET

DOCTRINE ....................................................................................................................... 19

LOSS CAUSATION........................................................................................................... 21

NO SAFE HARBOR .......................................................................................................... 21

SCIENTER ALLEGATIONS............................................................................................ 22

CLAIMS FOR RELIEF ..................................................................................................... 23

FIRST CLAIM FOR RELIEF ........................................................................................... 23

SECOND CLAIM FOR RELIEF ...................................................................................... 25

PRAYER FOR RELIEF ..................................................................................................... 26

DEMAND FOR JURY TRIAL .......................................................................................... 27

Plaintiff Mike Vega ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against Energy Transfer LP (the "Partnership" or "Energy Transfer") and Kelcy L. Warren ("Warren"), Energy Transfer's founder and chairman; Thomas E. Long ("Long") and Marshall S. McCrea III ("McCrea"), Energy Transfer's Co-Chief Executive Officers ("CEO"); Bradford Dickerson Whitehurst ("Whitehurst"), Energy Transfer's Chief Financial Officer ("CFO"); and John W. McReynolds ("McReynolds"), Energy Transfer's former President (collectively, the "Individual Defendants," and together with the Partnership (defined below), "Defendants"), based upon, *inter alia*, the investigation conducted by counsel, which included a review of the Partnership's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Partnership, analysts' reports and advisories about the Partnership and other information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Partnership and the Individuals Defendants. The Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Energy Transfer stock between April 13, 2017 and December 20, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Partnership and certain of its top officials.

2.      Energy Transfer is a Delaware company headquartered in Dallas, Texas. It was founded in 1996 and became a publicly traded partnership in 2006. The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018. Energy Transfer is a company engaged in natural gas and propane pipeline transport. The Partnership through its subsidiaries provides transportation, storage, and terminalling services for products like natural gas, crude oil, Natural Gas Liquids ("NGL"), and refined products.

3.      Throughout the Class Period, Defendants concealed and misrepresented that: (a) Energy Transfer had inadequate internal controls and procedures to prevent contractors from engaging in illegal conduct with regards to drilling activities, and/or failed to properly mitigate known issues related to such controls and procedures; (b) Energy Transfer through its subsidiary Rover Pipeline, LLC ("Rover") hired third-party contractor to conduct Horizontal Directional Drilling Activities ("HDD") for the Rover Pipeline Project (the "Project"), whose conduct of adding illegal additives in the drilling mud caused severe pollution near the Tuscarawas River when a large inadvertent release took place on April 13, 2017 (the "April 13 Release"); (c) Energy Transfer continually downplayed its potential civil liabilities when the Federal Energy Regulatory Commission ("FERC") was actively investigating the Partnership's wrongdoing related to the April 13 Release and consistently provided it with updated information about FERC's findings on this matter. These issues were foreseeably likely to subject Energy Transfer to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm, and would also materially impact Energy Transfer's financial results. These omissions and misrepresentations caused Energy Transfer's stock price to trade at artificially inflated prices throughout the Class Period.

4.      On August 8, 2019, Energy Transfer filed its quarterly report on Form 10-Q with

the SEC, reporting the Partnership's financial and operating results for the second quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q disclosed that *two years earlier*, in mid- 2017 FERC Enforcement Staff began a non-public formal investigation "regarding allegations that diesel fuel may have been included in the drilling mud at the Tuscarawas River HDD." The 2Q19 10-Q stated, in relevant part:

> Rover and the Partnership are cooperating with the investigations. Enforcement Staff has provided Rover its non-public preliminary findings regarding those investigations. The company disagrees with those findings and intends to vigorously defend against any potential penalty. Given the stage of the proceedings, and the non-public nature of the investigation, the Partnership is unable at this time to provide an assessment of the potential outcome or range of potential liability, if any.

5.      As a result of this news, the price of Energy Transfer stock declined 4.6% over two trading days, to close at $13.38 on August 12, 2019.

6.      Then on December 16, 2021, FERC publicly issued to Energy Transfer the Order To Show Cause And Notice of Proposed Penalty (the "FERC Order"), which proposed a $40 million fine for the inadvertent release incident.  On this news, the price of Energy Transfer shares declined $0.24, or 2.8% over the course of two trading days, to close at $8.25, on December 20, 2021. As a result of Energy Transfer's wrongful acts and omissions, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

9.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act

3

(15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District. Pursuant to Energy Transfer's most recent quarterly report (SEC Form 10-Q), as of May 5, 2022, there were 3,085,533,650 shares of the Partnership's common stock outstanding. Energy Transfer's common stock trades on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Energy Transfer's common stock located within the U.S., some of whom undoubtedly reside in this judicial district.

10.     In connection with the acts alleged in this Complaint, Energy Transfer, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

11.     Plaintiff is a resident of California. As set forth in the attached Certification(s), incorporated by reference herein, Plaintiff acquired Energy Transfer shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Energy Transfer is a Delaware public traded partnership with a principal place of business at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. Energy Transfer shares trade on the NYSE under the ticker symbol "ET."

13.     Defendant Warren is one of the founders of the Partnership and has served as the Executive Chairman of the Board of Directors for the Partnership.

14.     Defendant Long has served as the Partnership's Co-CEO since January 2021. He served as the Partnership's CFO from 2016 through 2020.

15.     Defendant McCrea has served as the Partnership's Co-CEO since January 2021. He served as President and Chief Commercial Officer of the Partnership from 2018 through 2020. He

has also served as a director of the Partnership since 2009.

16.     Defendant Whitehurst has served as the Partnership's CFO since January 2021. He also served as the Partnership's Executive Vice President from August 2014 through 2020.

17.     Defendant McReynolds served as the President of the Partnership from March 2005 to October 2018. He has also served as a director of the Partnership since August 2004.

18.     Defendants Warren, Long, McCrea, Whitehurst, and McReynolds are sometimes referred to herein as the "Individual Defendants."   The Individual Defendants, together with Energy Transfer, are sometimes referred to herein as the "Defendants."

19.     The Individual Defendants possessed the authority to control the contents of statements made by Energy Transfer in the Partnership's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  The Individual Defendants were provided with copies of the Partnership's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Due to their positions with Energy Transfer, and their access to Energy Transfer's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

A.     **Background**

20.     Founded in 1996, Energy Transfer is a Delaware company headquartered in Dallas, Texas. It became a publicly traded partnership in 2006. The Partnership was formerly known as Energy Transfer Equity, L.P. and changed its name to Energy Transfer LP in October 2018. It is now traded on the NYSE under the ticker symbol "ET."

21.     Energy Transfer provides energy-related services in the U.S. and China. The Partnership owns and operates approximately 11,600 miles of intrastate natural gas transportation pipelines, three natural gas storage facilities in Texas, and two natural gas storage facilities in Oklahoma. It also owns and operates approximately 26,900 miles of interstate natural gas pipelines. The Partnership sells natural gas to electric utilities, independent power plants, local distribution companies, industrial end-users, and other marketing companies. The Partnership also owns and operates natural gas gathering and NGL pipelines, processing plants, treating facilities, and conditioning facilities in, among other states, Pennsylvania, and transportation and supply of water to natural gas producers in Pennsylvania. The Partnership also owns approximately 5,215 miles of NGL pipelines; NGL and propane fractionation facilities; NGL storage facilities with working storage capacity of approximately 50 million Bbls; and other NGL storage assets and terminals with an aggregate storage capacity of approximately 17 million Bbls.

22.     Rover Pipeline, LLC is a subsidiary of Energy Transfer. Through Rover, Energy Transfer hired contractors to construct the Rover Pipeline, a 700-mile-long natural gas pipeline extending from southeastern Ohio to southern Michigan. In November 2016, Rover executed a $1.5 billion contract with Precision Pipeline LLC ("Precision"), a drilling company, which was the largest contractor on the Rover Pipeline Project and was responsible for installing much of the pipeline by open trench installation and through Horizontal Directional Drilling Activities. Precision in turn contracted with Pretec Directional Drilling, LLC ("Pretec"), an HDD company that shared the same parent company with Precision, to perform work as a subcontractor on the Project.

23.     Horizontal directional drilling is a technique frequently used by natural gas pipelines to drill a horizontal hole beneath obstacles, and thereafter pull the pipe through the hole.

6

To help the drill bit cut through soil and rock, drilling fluid is pumped through the drill pipe string. The drilling fluid exits the drill string through jet nozzles in the drill bit, lubricating and cooling the drill bit. The drilling fluid also suspends and, under normal circumstances, carries the soil and rock cuttings from the hole back to the surface through the space between the drill pipe string and the wall of the hole. Normally, the drilling fluid that was added to the hole makes its way back to containment pits at the entry or exit points, where it then passes through a cleaning system to remove cuttings before being recirculated back into the hole. In some instances, drilling fluid can escape the HDD hole and leak into the surrounding earth. In extreme cases, drilling fluid can emerge at the ground surface or in any other undesired location such as wetlands or water bodies, which is known as an inadvertent release.

24.     In order to succeed with trenchless drilling, drills rely on a constant circulation of mud through the drill to the bit and back out of the hole to lubricate the drill stem and allow forward progress. Losing returns means that mud is pumping down into the hole but is not circulating back out and thus, is "lost" down the hole. As a consequence of losing returns, new drilling mud had to be mixed via a mud system onsite, and then pumped into the hole, instead of being constantly recirculated. When there were returns of drilling mud, the mud system runs itself. When there were no returns, mixing and replacing the mud was a labor-intensive process. Workers had to cut 50-pound bags to mix clay with water all day and night. Drilling often had to shut down to catch up on mud by bringing more water onsite or mixing more clay. Thus, to keep up with a tight construction schedule under heavy pressure, HDD crews might be tempted to add unlawful additives such as diesel fuel to lubricate the drill if losing returns takes place. In such an instance, if an inadvertent release subsequently occurs, then these unlawful additives would leak into the

nearby environment along with the drilling fluid, causing a widescale contamination. This is exactly what happened with the Rover Pipeline Project.

25.     On February 2, 2017, FERC issued a certificate order granting approval of the Project with forty-five environmental conditions. The next day, Rover filed a statement accepting the certificate order. Then on March 3, 2017, FERC issued a notice to proceed with construction for the Project. Pretec's HDD crews started HDDs on March 18, 2017, at the site near the Tuscarawas River.

26.     On April 13, 2017, a large inadvertent release, later determined to be of nearly 2 million gallons of drilling mud, was discovered on the west side of the Tuscarawas River (the "April 13 Release").

27.     Following this incident, the Ohio Environmental Protection Agency ("Ohio EPA") issued a violation notice to Rover on April 20, 2017. On May 10, 2017, FERC's Office of Energy Projects ("OEP") issued a public letter to Rover, halting the HDD activities for the Project.

28.     In a public letter issued from OEP to Rover on June 1, 2017, the Director of OEP revealed that Ohio EPA had notified FERC of the presence of petroleum hydrocarbon constitutes, commonly found in diesel fuel, in samples of drilling fluid near the site of the April 13 Release, and thus FERC's Enforcement Staff decided to immediately initiate an investigation to determine the underlying facts that led to the presence of petroleum hydrocarbons in the drilling fluid.

29.     During the entire period of FERC's investigation, Energy Transfer consistently and intentionally omitted facts and made false statements about the magnitude of this legal proceeding because its executives felt the desperate need to hide it from the investors as they were well aware of the severity of their misconduct from the very beginning.

30.     On December 16, 2021, the investors finally learned the truth from a FERC News Release where FERC proposed a $40 million fine against Energy Transfer, a huge penalty that was "a departure" from FERC's Penalty Guidelines, which was justified by aggravating factors such as the serious environmental harm caused by the violation, the "ineffective and superficial" compliance program implemented, the severe lack of self-reporting of the incident, and the "obstructionist conduct" during the investigation.

### B.     Materially False and Misleading Statements Issued During the Class Period

31.     In a public weekly status report filed with FERC dated April 27, 2017, Rover referred to the April 13 Release as "*a common and normal* component of executing directional drilling operations" which occurred "[d]ue to the subsurface conditions and other environmental conditions of the locations," a gross mischaracterization of the fact that the HDD crews had caused a severe environmental disaster. Rover even went a step further to make the totally unsubstantiated and false assertion that the drilling fluid was "*a non-toxic,* naturally occurring bentonite clay water slurry that [was] safe for the environment." As it turned out, the FERC Order later revealed that Pretec's HDD crews lost returns of drilling mud on the first day of their HDD activities, and they "intentionally and routinely" added *toxic diesel fuel* and other unapproved lubricants from April 2 through April 13, 2017 to combat drilling difficulties and keep up with the extremely tight construction schedule set by Rover's management.

32.     As much as the executives would like to sweep it under the rug, the first indication of Energy Transfer's culpability started seeping onto the surface early. On July 31, 2017, third-party analyst J.D. Hair & Associates, Inc. released a report (the "J.D. Hair Report") prepared at the request of FERC as part of the investigation finding that:

PDD[1] did not provide documentation in their daily reports as to any other drilling practices, such as adjusting drilling fluid properties, or mixing a thick bentonite plug in an attempt to seal the formation. In addition, they did not document procedures or measures for minimizing the risk of an IR while continuing without drilling fluid circulation. Due to lack of operational details and commentary in PDD's reports, it is not possible for JDH&A to provide a firm opinion with respect to whether or not PDD's operational measures to restore circulation or their drilling procedure to minimize the risk of IR's met HDD industry standards. ***If PDD performed no other measures than what is indicated in their reports, then it is the opinion of JDH&A that they did fall short of common HDD industry practices used to restore drilling fluid circulation*** as outlined in Drilling Fluids in Pipeline Installation by Horizontal Directional Drilling.[2]

33.     The J.D. Hair Report did not specifically address the presence of diesel in the drilling fluid near the site of April 13 Release. Still, Energy Transfer and Rover's executives panicked at the possibility that the investors might glean from the J.D. Hair Report about the magnitude of the environmental catastrophe caused by their misconduct. Thus, Rover crafted a response letter on August 4, 2017, categorically rejecting that the presence of diesel could be attributed to its own oversight:

> Rover theorizes that these diesel concentrations could have been caused by an ***inadvertent and unreported spill or leak from equipment operating during the clean-up of the IR***, or it could have been the ***deliberate or malicious act of individuals opposed to the project***. Given the extensive inspection and oversite at this and other sites along the project, ***it is difficult to imagine that this occurred from an unreported spill or leak***.

34.     On August 21, 2017, FERC authorized its Enforcement Staff to conduct a non-public, formal investigation on the underlying facts that led to the presence of diesel in the drilling fluid at the April 13 Release site.

---

[1] Pretec Directional Drilling, LLC
[2] Unless otherwise noted, all emphasis herein and hereinafter is added.

35.   Energy Transfer's press releases **never once** mentioned the on-going formal investigation, but instead on many occasions touted the progress of the Project and the approvals by FERC:

> DALLAS--(BUSINESS WIRE)--Aug. 31, 2017-- Energy Transfer Partners (NYSE: ETP) announced today the Federal Energy Regulatory Commission (FERC) approved its request to put Phase 1A of the Rover Pipeline into service. Phase 1A, the 212-mile section from Cadiz, Ohio, to Defiance, Ohio, will begin natural gas service on August 31, 2017.

> DALLAS--(BUSINESS WIRE)--Sep. 19, 2017-- Energy Transfer Partners (NYSE:ETP) is pleased to announce that the Federal Energy Regulatory Commission (FERC) has approved the Partnership's request to resume Horizontal Directional Drilling (HDD) operations along the Rover Pipeline Project. Drilling operations on nine HDD locations approved by the FERC are expected to begin within the week with an emphasis on the Captina Creek HDD in Belmont County, Ohio. The completion of the Captina Creek HDD will allow the full Phase 1 portion of Rover from Seneca, Ohio, to Defiance, Ohio, to be placed into service by the end of the year. Phase 1a of the Rover Project from Cadiz, Ohio, to Defiance, Ohio, was successfully put into service on August 31, 2017.

> DALLAS--(BUSINESS WIRE)--Dec. 15, 2017-- Energy Transfer Partners, L.P. (NYSE: ETP) announced today that Rover Pipeline, LLC received approval from the Federal Energy Regulatory Commission (FERC) to place Phase 1B of the Rover Pipeline project into service, bringing the 713-mile pipeline closer to its 3.25 billion cubic feet per day design total. With the addition of the Phase 1B facilities, the project is now capable of transporting up to 1.7 billion cubic feet per day of natural gas. Rover shippers now have access to six additional receipt points from Seneca thru Clarington areas of the Marcellus and Utica supply basins with an incremental receipt capacity of 2.45 billion cubic feet per day. Rover has been in partial service from Cadiz, Ohio, to Defiance, Ohio since August 31, 2017, capable of transporting 1 billion cubic feet per day of natural gas.

> DALLAS--(BUSINESS WIRE)--May 1, 2018-- Energy Transfer Partners, L.P. (NYSE: ETP) announced today that Rover Pipeline, LLC received approval from the Federal Energy Regulatory Commission (FERC) to place additional Phase 2 facilities into service. Last week, FERC granted Rover permission to place a segment of Phase 2, which included Mainline Compressor Station 3 located in Crawford County, Ohio, and a section of the line between Mainline Compressor Station 2, in Wayne County, Ohio, and Mainline Compressor Station 3, in service for additional throughput opportunity. The approval from FERC granted today allows for the full commercial operation capability of the Market Zone North Segment.

11

DALLAS--(BUSINESS WIRE)--May 31, 2018-- Energy Transfer Partners, L.P. (NYSE: ETP) announced today that Rover Pipeline, LLC received approval from the Federal Energy Regulatory Commission (FERC) to commence service of the Supply Connector B and full Mainline B pipeline segments. This latest approval allows for 100 percent of Rover's mainline capacity, 3.25 billion cubic feet per day of natural gas, to be placed into service.

36.     In the meantime, as the FERC order later disclosed, Energy Transfer and Rover's executives were busy "preserving" their documents and data in response to FERC's subpoenas. On October 3, 2017, Rover's Executive Vice President of Engineering and Construction, Joey Mahmoud, stated in an affidavit to Enforcement Staff that he accidentally deleted all of the data stored on his phone and thus failed to retain the data according to the preservation notices. Enforcement Staff issued an additional subpoena in November 2017 and Rover's production was supposed to be complete in March 2018. However, in May 2018, Rover produced more than 4,000 documents that were previously withheld or redacted, and that were not included in their privilege claims.

37.     On February 23, 2018, Energy Transfer filed its yearly report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 Annual Report").  The 2017 Annual Report was signed by Defendant McReynolds as then-President and Defendant Long as then-CFO. Appended as Exhibits 31.1, 31.2, 32.1, and 32.2 to the 2017 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein Defendants McReynolds and Long certified that "[the 2017 Annual Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading" and that "the information contained in the [2017 Annual Report] fairly presents, in all material respects, the financial condition and results of operations of the Partnership." The Individual Defendants signed similar statements in connection with the 10-K yearly reports and the 10-Q quarterly reports filed with the SEC during the Class Period.

38.     The 2017 Annual Report touted the capacity of the partially completed Rover Pipeline:

> The Rover Pipeline is a new 713-mile natural gas pipeline designed to transport 3.25 Bcf/d of domestically produced natural gas from the Marcellus and Utica Shale production areas to markets across the United States as well as into the Union Gas Dawn Storage Hub in Ontario, Canada, for redistribution back into the United States or into the Canadian market. Currently under construction, portions of the pipeline are in service transporting gas from processing plants in Eastern Ohio for delivery to other pipeline interconnects in Eastern Ohio as well as the Midwest Hub near Defiance, Ohio, where the gas will be delivered for distribution to markets across the United States. The Rover Pipeline Phase 1A and 1B are in service with a capacity of approximately 1.7 Bcf/d.

39.     On the subject of the April 13 Release, the 2017 Annual Report emphasized the progress that Rover achieved in complying with FERC's requirements:

> In addition, on May 10, 2017, the FERC prohibited Rover from conducting HDD activities at 27 sites in Ohio. On July 31, 2017, the FERC issued an independent third party assessment of what led to the release at the Tuscarawas River site and what Rover can do to prevent reoccurrence once the HDD suspension is lifted. ***Rover notified the FERC of its intention to implement the suggestions in the assessment and to implement additional voluntary protocols. In response, FERC authorized Rover to resume HDD activities at certain sites.*** On January 24, 2018, FERC ordered Rover to cease HDD activities at the Tuscarawas River HDD site pending FERC review of additional information from Rover. Rover continues to correspond with regulators regarding drilling operations and drilling plans at the HDD sites where Rover has not yet completed HDD activities, including the Tuscarawas River HDD site. The timing or outcome of this matter cannot be reasonably determined at this time. ***We do not expect there to be a material impact to its results of operations, cash flows or financial position***.

40.     The 2017 Annual Report omitted the critical fact that FERC's Enforcement Staff had already initiated a formal investigation on this matter. It also failed to disclose that the J.D. Hair Report concluded that Pretec's practices related to the Project fell short of common HDD industry practices used to restore drilling fluid circulation.

41.     For two years, Energy Transfer's disclosures related to the April 13 Release remained substantially the same in subsequent quarterly reports and annual reports filed with SEC,

omitting any information related to the on-going FERC investigation or the presence of diesel in the drilling fluid at the April 13 Release site. Specifically, such quarterly reports and annual reports included the 2018 first quarter Form 10-Q filed on May 10, 2018, the 2018 second quarter Form 10-Q filed on August 9, 2018, the 2018 third quarter Form 10-Q filed on November 8, 2018, the 2018 Form 10-K filed on February 22, 2019, and the 2019 first quarter Form-Q filed on May 9, 2019.

42.     As early as January 2021, the Enforcement Staff issued a letter to Rover stating that it would be recommending FERC to issue an Order to Show Cause why Rover should not be made the subject of a public enforcement proceeding and pay a civil penalty. Still, Energy Transfer made no efforts at all to disclose such material information to the investors.

**C.     The Truth Begins to Emerge**

43.     Cratering under the overwhelming evidence gathered by FERC's Enforcement Staff, Energy Transfer's executives had no other choice but to make a disclosure regarding the on-going investigation. Even so, they used every euphemism they could find to cover up the truth. On August 8, 2019, *two years after* the formal investigation started, Energy Transfer in the 2Q19 10-Q stated that in mid-2017 Enforcement Staff initiated a non-public formal investigation "regarding allegations that diesel fuel *may have been included* in the drilling mud at the Tuscarawas River HDD" (emphasis added). The 2Q19 10-Q stated, in relevant part:

> Rover and the Partnership are cooperating with the investigations. ***Enforcement Staff has provided Rover its non-public preliminary findings regarding those investigations***. The company disagrees with those findings and intends to vigorously defend against any potential penalty. Given the stage of the proceedings, and the non-public nature of the investigation, the Partnership is unable at this time to provide an assessment of the potential outcome or range of potential liability, if any.

44.     On this news, the price of Energy Transfer stock declined $0.65, or 4.6% over two trading days, to close at $13.38 on August 12, 2019.

45.     Despite this decline, the 2Q19 10-Q did not disclose any information related to Enforcement Staff's preliminary findings and did not provide any meaningful way for investors to assess the severity of the on-going investigation. The Partnership's stock continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions.

46.     Defendants repeated this same disclosure in the 2019 Form 10-K filed on February 21, 2020 and the 2020 Form 10-K filed on February 19, 2021.

47.     On December 16, 2021, FERC publicly issued to Rover and Energy Transfer the Order To Show Cause and Notice of Proposed Penalty, which directed Rover to show cause why it should not be assessed a civil penalty in the amount of $40,000,000. The FERC Order presented allegations by the Enforcement Staff that (1) Rover intentionally included diesel fuel and other toxic substances and unapproved additives in the drilling mud during its HDDs under the Tuscarawas River; (2) Rover failed to adequately monitor the right-of-way at the site of the Tuscarawas River HDD operation; and (3) Rover improperly disposed of inadvertently released drilling mud that was contaminated with diesel fuel and hydraulic oil.

48.     The FERC Order revealed that on March 18, 2017, when Pretec's HDD crews started HDDs at the site near the Tuscarawas River, the crews lost returns of drilling mud. To keep up the tight construction schedule under heavy pressure from Rover's management, from April 2 through April 13, 2017, multiple HDD crew members intentionally and routinely added toxic diesel fuel, hydraulic oil, contaminated containment fluids, and non-toxic but unapproved lubricants to combat drilling difficulties and keep up with drilling progress demands. Rover's HDD crew members have admitted under oath to doing so, and have provided numerous corroborating

accounts of what occurred and how the conduct was openly discussed among onsite personnel. The order states:

> Contemporaneous evidence demonstrates that ***these violations were the product of a corporate culture***—one that equally infected the executives managing the Tuscarawas River HDD and the onsite HDD crew—***that favored speed and construction progress over regulatory compliance***. This culture was fueled by Rover's execution of a $1.5 billion "time is of the essence" contract with a prime construction contractor—which constituted 35% of Rover's initial cost estimate for the Project.8 It was also fueled by Rover's self-imposed four-month schedule to complete over 500 miles of the pipeline construction. In addition to the contract requirements, Rover's Executive Vice President of Engineering and Construction, Yousif (Joey) Mahmoud, continually applied direct pressure on the Vice President of its prime contractor, Bobby Poteete, to speed up construction, which funneled down to its subcontractor and HDD crews onsite.

49.     The FERC Order further disclosed that on October 3, 2017, Rover's Executive Vice President of Engineering and Construction, Joey Mahmoud, submitted an affidavit to Enforcement Staff regarding his failure to preserve data despite preservation notices issued by OEP and Enforcement Staff, stating that after getting locked out of his phone, he reset it and thus deleted all of the data stored on it. Enforcement Staff issued an additional subpoena in November 2017. Rover's production was purportedly complete in March 2018. However, on May 21, 2018, Rover produced more than 4,000 documents that were previously withheld or redacted, and that were not included in their privilege claims. Rover's production was complete nearly a year from the original data request and eight months from the first subpoena deadlines. Since June 2017, Enforcement reviewed more than 25,000 documents produced by Rover and third parties, and took the testimony of 24 witnesses.

50.     The FERC Order also made apparent that as early as January 19, 2021, Enforcement Staff issued a letter to Rover that it would be recommending FERC to issue an Order to Show Cause why Rover should not be made the subject of a public enforcement proceeding and pay a civil penalty. The Partnership never made any public disclosure regarding such a notice.

51.    On this news, the price of Energy Transfer shares declined $0.24, or 2.8% over the course of two trading days, to close at $8.25, on December 20, 2021, causing investors to lose more than $730 million in shareholder wealth.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired Energy Transfer shares during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants, the officers and directors of the Partnership, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the Class Period, Energy Transfer shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Partnership's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

55.    The Plaintiff will fairly and adequately protect and represent the interests of

members of the Class. Plaintiff is an adequate representative of the Class and have no interest which is adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

56.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Energy Transfer and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about the severity of the April 13 Release incident and the scope and progress of the formal investigation by FERC against Energy Transfer;

- whether Energy Transfer and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Energy Transfer's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Energy Transfer shares during the Class Period were impacted by Energy Transfer's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

57.     A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

58.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of

inconsistent or varying adjudications establishing incompatible standards of conduct for Energy Transfer and the Individual Defendants.

59.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

60.     The market for Energy Transfer shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Energy Transfer's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Partnership's shares relying upon the integrity of the market price of Energy Transfer shares and market information relating to Energy Transfer and have been damaged thereby.

61.     During the Class Period, the artificial inflation of Energy Transfer's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Energy Transfer's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Energy Transfer's financials and its business, operations, and prospects, thus causing the price of the Partnership's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Energy Transfer shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Energy Transfer shares at such artificially inflated prices, and each of them has been damaged as a result.

19

62.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Energy Transfer and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Energy Transfer shares were traded on the NYSE and were covered by numerous analysts;

- Energy Transfer shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Energy Transfer shares; and

- Plaintiff and Class members purchased and/or sold Energy Transfer shares between the time Energy Transfer and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

63.     As a result of the foregoing, the market for Energy Transfer shares promptly digested current information regarding Energy Transfer from all publicly available sources and reflected such information in Energy Transfer's share price. Under these circumstances, all purchasers of Energy Transfer's shares during the Class Period suffered similar injury through their purchase of Energy Transfer's shares at artificially inflated prices. Thus, a presumption of reliance applies.

64.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

65.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the

Partnership's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **LOSS CAUSATION**

66.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

67.     During the Class Period, Plaintiff and the Class purchased Energy Transfer's shares at artificially inflated prices and were damaged thereby. The price of Energy Transfer shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## **NO SAFE HARBOR**

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Energy Transfer and the Individual Defendants are liable for those false and misleading forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Energy Transfer who knew that those statements were false and misleading when made.

## SCIENTER ALLEGATIONS

69.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Partnership were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Energy Transfer and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Energy Transfer, their control over, and/or receipt and/or modification of Energy Transfer's allegedly materially misleading misstatements and/or their associations with the Partnership which made them privy to confidential proprietary information concerning Energy Transfer, participated in the fraudulent scheme alleged herein.

70.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Partnership, including the Individual Defendants.

71.    The Individual Defendants, because of their positions with Energy Transfer, made and/or controlled the contents of the Partnership's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants is responsible for the accuracy of Energy Transfer's corporate statements and are therefore responsible and liable for the representations contained therein.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)
Against All Defendants**

72.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

73.     During the Class Period, Energy Transfer and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

74.     Energy Transfer and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Energy Transfer shares during the Class Period.

75.     Energy Transfer and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Energy Transfer were materially false and

misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws.  Energy Transfer and the Individual Defendants, through receipt of information reflecting true facts about Energy Transfer, their control over, and/or receipt of or modification to Energy Transfer's allegedly materially misleading statements, which made them aware of Energy Transfer's confidential proprietary information, participated in the fraudulent scheme complained of herein.

76.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Energy Transfer, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Energy Transfer employees to investors, including Plaintiff and Class members.  These misrepresentations and omissions were material.  A reasonable investor would consider the facts—such as the severity of the April 13 Release incident and the scope and the progress of the formal investigation by FERC —important in deciding whether to buy shares of Energy Transfer stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts

77.    Pursuant to the foregoing, the price of Energy Transfer shares was artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Energy Transfer and the Individual Defendants, Plaintiff and Class members relied on the statements made by Energy Transfer and the Individual Defendants and/or the integrity of the market price of Energy Transfer shares during the Class Period in purchasing Energy Transfer shares at prices that were artificially inflated due to false and misleading statements made by Energy Transfer and the Individual Defendants.

78.     Were Plaintiff and Class members made aware that the market price of Energy Transfer shares was artificially and falsely inflated by misleading statements made by Energy Transfer and the Individual Defendants, and by material adverse information that Energy Transfer and the Individual Defendants failed to disclose, they would not have purchased Energy Transfer shares at artificially inflated prices, or purchased them at any price.

79.     Based on the wrongful conducts alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

80.     Energy Transfer and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Energy Transfer shares during the Class Period.

### SECOND CLAIM FOR RELIEF

**(Violation of Section 20(a) of the Exchange Act)**
**Against the Individual Defendants**

81.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

82.     During the Class Period, the Individual Defendants were involved in the management and operation of Energy Transfer's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Energy Transfer's business model, strategy, valuation, and revenue targets and goals and false representations in connection therewith.

83.     As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Energy Transfer's financial condition and results of operations, and to correct any public statements issued by Energy Transfer which were materially false or misleading.

84.     Due to their positions of authority at Energy Transfer, the Individual Defendants controlled the contents of various public filings, press releases and reports which Energy Transfer disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause Energy Transfer to execute the wrongful acts alleged herein.  The Individual Defendants were therefore "controlling persons" at Energy Transfer pursuant to Section 20(a) of the Exchange Act.  On this basis, they were participants in the unlawful conduct alleged which caused the prices of Energy Transfer shares to be artificially inflated.

85.     Based on the conduct described above, the Individual Defendants are liable for the violations committed by Energy Transfer pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.     Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

B.     Awarding damages in favor of Plaintiff and members of the Class against Energy Transfer and the Individual Defendants, jointly and severally, for all damages sustained as a result of Energy Transfer's wrongdoing, in an amount to be proven at trial;

C.     Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.     Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.     Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: June 3, 2022

**LOWEY DANNENBERG, P.C.**

/s/*Andrea Farah*
Andrea Farah
Yuanchen Lu
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
Email: afarah@lowey.com
        ylu@lowey.com

*Counsel for Plaintiff*